## UNITED STATES DISTRICT COURT
## DISTRICT OF MONTANA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| Plaintiff, | )   Civil Action No. 1:19-cv-48-SPW-TJC |
| | ) |
| v. | )   Judge Watters |
| | ) |
| EXXONMOBIL PIPELINE COMPANY | ) |
| | ) |
| Defendant. | ) |

## CONSENT DECREE

A.     WHEREAS, Plaintiff, United States of America, on behalf of the United States Environmental Protection Agency ("EPA"), filed a complaint in this action, concurrently with this Consent Decree, alleging that Defendant ExxonMobil Pipeline Company ("ExxonMobil" or "Defendant") is liable for violations of Sections 301(a) and 311(b)(3) of the Clean Water Act ("CWA" or "the Act"), 33 U.S.C. §§ 1311(a) and 1321(b)(3), as a result of the July 1, 2011 discharge of more than 1,500 barrels of crude oil from its Silvertip Pipeline into and upon the Yellowstone River and adjoining shorelines in a quantity as may be harmful (the "Discharge") near Laurel, Montana.

B.     WHEREAS, Defendant undertook cleanup actions shortly thereafter and in conjunction with a July 6, 2011 Administrative Order issued by the EPA and under a February 28, 2012 Administrative Order on Consent between the Montana Department of Environmental Quality and Defendant.

C.     WHEREAS, on July 5, 2011, the Pipeline and Hazardous Materials Safety Administration ("PHMSA") issued Defendant a Corrective Action Order directing ExxonMobil, among other things, to construct a new horizontally directionally drilled crossing for the Silvertip

Pipeline under the Yellowstone River in Laurel, Montana, to conduct risk assessments of all other major Silvertip Pipeline water crossings, to submit a contingency plan to operate and monitor the Silvertip Pipeline during flood conditions, and to revise its spill response plan. On August 8, 2012, PHMSA determined that the required actions had been completed.

D.    WHEREAS, on January 23, 2015, PHMSA issued a Final Order to ExxonMobil that assessed a civil penalty of $1,045,000 for alleged violations of PHMSA regulations, including failing to consider the risk of flooding and river bottom scour and other risk factors relevant to the Yellowstone River crossing in its risk analysis for the Silvertip Pipeline (49 C.F.R. § 195.452(i)(2)), failing to effectively train emergency response personnel (49 C.F.R. § 195.403(a)(3)), failing to establish adequate written procedures to respond to seasonal flooding of the Yellowstone River (49 C.F.R. § 195.402(e)(2)), and failing to establish adequate written procedures to minimize the volume of liquid released in the event of a pipeline failure (49 C.F.R. 195.402(e)(4)); and on July 9, 2015 PHMSA issued a closeout letter with a determination that ExxonMobil had complied with the Final Order.

E.    WHEREAS, in addition to the actions required by this Consent Decree and the PHMSA orders, ExxonMobil has advised the United States that it has undertaken the following actions:

1.    Following the Discharge, ExxonMobil developed a Water Crossing Program described more fully in the document referenced in Paragraph 13, below, to identify and manage the risk of an oil spill from its pipelines where pipelines cross water, including risks from physical forces of water during high flow storms which could cause, either abruptly or over time, an unacceptable unsupported span length or exceedance of pipeline physical limitations.

2

ExxonMobil electronically maintains and tracks information related to the Water Crossing Program.

2.    ExxonMobil has implemented the Water Crossing Program by prioritizing the Silvertip Pipeline water crossings, characterizing each of the Silvertip Pipeline water crossings, horizontally drilling below nine Silvertip Pipeline water crossings (including four water crossings identified as high-priority), and taking other mitigation action at at least four other water crossings.  The mitigation actions include the following:

| Water Crossing Program ID | Waterway Name | Mitigation |
|---|---|---|
| RM-0001 | Clarks Fork | Horizontally drilled |
| RM-0002 | Rock Creek | Horizontally drilled |
| RM-0003 | Yellowstone River-Billings | Horizontally drilled |
| RM-0090 | Yellowstone River-Laurel | Horizontally drilled |
| RM-0046 | Sand Creek S. Span | Horizontally drilled |
| RM-0047 | Sand Creek - Middle S. Span | Horizontally drilled |
| RM-0048 | Sand Creek - Middle N. Span | Horizontally drilled |
| RM-0049 | Sand Creek N. Span | Horizontally drilled |
| RM-0050 | Sand Creek | Horizontally drilled |
| RM-0104 | Canyon Creek | Pipe Support improvements |
| RM-0012 | Wash 4.5 mi. N. of Silver Tip Sta. | Armoring |
| RM-0082 | Mason Canal | Pipe Support improvements |
| RM-0107 | Span 0.28 miles N of 24th Street W | Armoring and Pipe Support improvements |

3.    ExxonMobil modified its Operations Control Center (OCC) Operating Instructions with respect to the Silvertip Pipeline in situations where a leak is

3

suspected, but the location is not known.  In addition, a SCADA display was created to show the elevation of each mainline block valve on the pipeline system which depicts the hydraulic profile of the system within the OCC. ExxonMobil also added high water protocols to the OCC Operating Instructions for the Silvertip Pipeline system to coordinate actions with Field Operations and Maintenance personnel based upon the river flow rates during flooding conditions, including river flow rate thresholds for shutting down the Silvertip Pipeline.

F.      WHEREAS, Defendant has reimbursed approximately $1,602,638.59 of Natural Resource Damage Assessment Costs incurred by Federal and State Natural Resource Trustees (Trustees) and has paid $12 million to fund restoration projects selected by the Trustees to resolve a lawsuit brought by the Trustees under Section 1002 of the Oil Pollution Act, 33 U.S.C. § 2702, and Montana state law.

G.      WHEREAS, by entering into this Consent Decree, Defendant does not admit the allegations in the Complaint filed in this action, or any liability to the United States.

H.       WHEREAS, the Parties agree that settlement of this matter without further litigation is in the public interest and that the entry of this Consent Decree is the most appropriate means of resolving this action.

I.      WHEREAS, the Parties agree, and by entering this Consent Decree the Court finds, that this Consent Decree: (1) has been negotiated by the Parties at arm's length and in good faith, (2) will avoid prolonged litigation between the Parties; (3) is fair and reasonable; and (4) furthers the objectives of the CWA.

NOW, THEREFORE, before taking testimony and without adjudication or admission of any issue of fact or law, or liability, except as provided above and in Section I, below, and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## I.    JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of the United States' claims in this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and Sections 309(b), 309(d), and 311(b)(7)(E) and (n) of the CWA, 33 U.S.C. §§ 1319(b), 1319(d), 1321(b)(7)(E) and (n).  The Court has personal jurisdiction over the Parties to this Consent Decree.

2.      Venue lies in this judicial district pursuant to 28 U.S.C. §§ 1391 and 1395 because the claims arose in this district and Defendant is located and doing business in this district.

3.      For purposes of this Decree, or any action to enforce this Decree, Defendant consents to the Court's jurisdiction over this Decree or such action and over Defendant and consents to venue in this judicial district.

4.      Notice of commencement of this action has been given to the State of Montana as required by Section 309(b) of the CWA, 33 U.S.C. § 1319(b).

## II.    APPLICABILITY

5.      The obligations of this Consent Decree apply to and are binding upon the United States, and upon Defendant and any successors, assigns, or other entities or persons otherwise bound by law.

6.      No transfer of ownership or operation of any portion of the Silvertip Pipeline System shall relieve Defendant of its obligation to ensure that the requirements of this Consent Decree are implemented.

7.      In any action to enforce this Consent Decree, Defendant shall not raise as a defense the failure by any of its officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

### III.    DEFINITIONS

8.      Terms used in this Consent Decree that are defined in the CWA shall have the meanings assigned to them in the Act, unless otherwise provided in this Decree.  Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

a.      "Complaint" shall mean the Complaint filed by Plaintiff in this action.

b.      "Consent Decree" or "Decree" shall mean this document.

c.      "Day" shall mean a calendar day unless expressly stated to be a working day.  In computing any period of time under this Consent Decree, the rules set forth in Rule 6(a) of the Federal Rules of Civil Procedure shall be followed.

d.      "Defendant" shall mean ExxonMobil Pipeline Company, a Delaware corporation.

e.      "Discharge" shall mean the crude oil spill commencing on July 1, 2011, from the Silvertip Pipeline, near Laurel, Montana.

f.      "Effective Date" shall have the definition provided in Section XV.

g.      "EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies.

h.      "Interest" shall mean interest at the rate specified in 28 U.S.C. § 1961.

6

i.      "Facility" shall mean the 12-inch-diameter, interstate pipeline, also known as the "Silvertip Pipeline," which includes a section that runs near Laurel, Montana.

j.      "NRC" shall mean the United States Coast Guard National Response Center.

k.      "Paragraph" shall mean a portion of this Decree identified by an Arabic numeral.

l.      "Parties" shall mean the United States, on behalf of EPA, and Defendant ExxonMobil Pipeline Company.

m.      "Plaintiff" shall mean the United States.

n.      "Section" shall mean a portion of this Decree identified by a Roman numeral.

o.      "United States" shall mean the United States of America, acting on behalf of EPA.

p.      "Water Crossing Program" shall mean Defendant's iterative evaluation process for characterizing and mitigating risks at pipeline water crossings as referenced in Paragraph 13, below.

## IV.    CIVIL PENALTIES

9.      Within thirty (30) Days after the Effective Date of this Consent Decree, Defendant shall pay to the United States the sum of $1,050,000, as a civil penalty.

10.     Defendant shall pay the civil penalty due by FedWire Electronic Funds Transfer ("EFT") to the U.S. Department of Justice in accordance with written instructions to be provided to Defendant, following lodging of this Consent Decree, by the Financial Litigation Unit of the U.S. Attorney's Office for the District of Montana.  Such monies are to be deposited in the Oil

Spill Liability Trust Fund.  The payment shall reference the Civil Action Number assigned to this case and DOJ Number 90-5-1-1-10332 and shall specify that the payment is made for CWA Section 311 civil penalties to be deposited into the Oil Spill Liability Trust Fund pursuant to 33 U.S.C. § 1321(s) and 26 U.S.C. § 9509(b)(8). Any funds received after 11:00 a.m. Eastern Standard Time shall be credited on the next business day.

11.    At the time of payment, Defendant shall send a copy of the EFT authorization form and the EFT transaction record, together with a transmittal letter, which shall state that the payment is for the civil penalty owed pursuant to this Consent Decree, and shall reference the Civil Action Number assigned to this case and DOJ Number 90-5-1-1-10332, to the United States in accordance with Section XIV of this Decree (Notices) and to:

>Stephen C. Ewart
>National Pollution Funds Center
>4200 Wilson Boulevard, Suite 1000
>Arlington, VA 22203-1804
>
>     and
>
>Chief
>United States Coast Guard
>Office of Claims and Litigation CG-0945
>US Coast Guard Mailstop 7213
>2703 Martin Luther King Jr. Avenue, SE
>Washington, DC 20593-7213
>
>     and
>
>the EPA Cincinnati Finance Office at: acctsreceivable.CINWID@epa.gov.

12.    Defendant shall not deduct or capitalize the civil penalty paid under this Section in calculating federal income tax or any state income tax.

## V.      INJUNCTIVE RELIEF

13.      Appendix 1 to this Consent Decree is a written description of the Water Crossing Program that Defendant developed after the Discharge.

14.      Appendix 2 to this Consent Decree is ExxonMobil's certification that it has completed the Classification Phase and Risk Assessment Phase (if necessary) of its Water Crossing Program, as these phases are described in Appendix 1, for each of the water crossings on the Silvertip Pipeline listed in Paragraph 15, below, by doing the following:

a.   evaluating, for each water crossing, all appropriate factors, including unsupported span length, scour or erosion modeling, flood events and duration, in accordance with ASME B31.4 Code of Pipeline Transportation Systems for Liquids, Bending Stress and Vortex Induced Vibration (VIV);

b.   conducting an onsite survey of each water crossing using ExxonMobil's water crossing checklist, and performing desktop evaluations of available information, including but not limited to USGS maps, USGS flow data, Google earth, ExxonMobil inspections, historical information and other available sources to fully evaluate the river or stream conditions;

c.   putting available public and field data, descriptions, evaluations, checklists, reports and other information into the electronic Water Crossing Program classification tool;

d.   generating an electronic Classification Report for each water crossing that includes information from the Water Crossing Program classification tool, including a description of classification results: hydrology, hydraulics, and mechanical threats;

e.  for those water crossings that the Classification Report classifies as High, Medium, or Low, generating an electronic Risk Assessment Summary Report, including a description of scenarios assessed during risk assessment, any mitigation identified including High Water Action Plan (if necessary), and the schedule for the completion of any such mitigation (if necessary); and

f.  subjecting all water crossings to the Monitoring Phase of the Water Crossing Program for the development of a monitoring plan.

15.  The following Silvertip Pipeline water crossings are subject to the certification requirements of Paragraphs 14 and 17:

| Water Crossing Program ID | Original 2013 Priority | Waterway Name |
|---|---|---|
| RM-0012 | L2 | Wash 4.5 mi. N. of Silver Tip Sta. |
| RM-0013 | L2 | Creek 4.7 mi. N. of Silver Tip Sta. |
| RM-0035 | L2 | Span at Mile Post 52 |
| RM-0037 | L2 | Webber Lane Span |
| RM-0038 | L2 | Draw that feeds Clarks Fork River |
| RM-0046 | Low | Sand Creek S. Span |
| RM-0047 | Low | Sand Creek - Middle S. Span |
| RM-0048 | Low | Sand Creek - Middle N. Span |
| RM-0049 | Low | Sand Creek N. Span |
| RM-0061 | L2 | Draw span 0.42 mi. S. of Montaqua Rd. |
| RM-0069 | Low | Elbow Creek |
| RM-0070 | L2 | Stream span E. of 310 and Young Rd. |
| RM-0079 | L2 | White Horse Canal |
| RM-0082 | L2 | Mason Canal |
| RM-0093 | L1 | Canyon Creek Ditch span near the railyard |
| RM-0101 | L1 | Unnamed Ditch |
| RM-0107 | L2 | Span 0.28 mi. N. of 24th St. W |
| RM-0109 | L2 | Yale Tank Farm Span |
| RM-0110 | L2 | Span 0.14 mi. N. of Brickyard Lane |
| RM-0111 | L2 | Span S. of XOM Refinery near Cerise Rd Culvert |
| RM-0007 | L2 | Unnamed Creek |
| RM-0014 | L2 | Unnamed Creek |
| RM-0015 | L2 | Unnamed Creek |
| RM-0016 | L2 | Unnamed Creek |

| RM-0022 | L2  | Unnamed Creek      |
|---------|-----|--------------------|
| RM-0026 | Low | Irrigation Ditch   |
| RM-0027 | Low | Hunt Creek         |
| RM-0030 | Low | Irrigation Ditch   |
| RM-0055 | L2  | Unnamed Creek      |
| RM-0056 | L2  | Unnamed Creek      |
| RM-0057 | L2  | Unnamed Creek      |
| RM-0058 | L2  | Unnamed Creek      |
| RM-0064 | L2  | Unnamed Creek      |
| RM-0099 | L2  | Canyon Creek Ditch |

## VI.   FINAL REPORT

16.     No fewer than 180 Days prior to submitting a Request for Termination pursuant to Section XVIII (Termination), Defendant shall submit to the EPA in accordance with Section XIV (Notices) a Final Report that shall provide an evaluation of its implementation of the injunctive relief requirements set forth in this Consent Decree.  This evaluation is to be provided after Defendant has fulfilled all of its obligations under this Consent Decree and shall include: (1) a description of each injunctive relief requirement of this Consent Decree and the approximate date it was completed; and (2) summary of Defendant's progress in completing the Classification Phase and the Risk Assessment Phase (if necessary) for those water crossings identified in Paragraph 15, above, including electronic copies of applicable Classification and/or Risk Assessment reports completed and, if the Risk Assessment shows mitigation is necessary at any of the water crossings identified in Paragraph 15, above, a summary of Defendant's progress in undertaking the needed mitigation; and (3) a narrative description of the aspects/elements of the Water Crossing Program that Defendant expects to remain in place upon termination of this Consent Decree.

## VII.   CERTIFICATION

17.     The certification required in Paragraph 14, above, shall be signed by an official of

Defendant, and must contain the following statement:

> I certify under penalty of law that this document and all attachments were
> prepared under my direction or supervision in accordance with a system
> designed to assure that qualified personnel properly gather and evaluate the
> information submitted.  Based on any personal knowledge I may have and
> my inquiry of the person or persons who manage the system, or those
> persons directly responsible for gathering the information, the information
> submitted is, to the best of my knowledge and belief, true, accurate, and
> complete. I am aware that there are significant penalties for submitting false
> information, including the possibility of fines and imprisonment for
> knowingly and willfully submitting a materially false statement.

## VIII.   STIPULATED PENALTIES

18.     Defendant shall be liable for stipulated penalties to the United States for

violations of this Consent Decree as specified below, unless excused under Section IX (Force

Majeure).  A violation includes failing to perform any obligation required by the terms of this

Decree according to all applicable requirements of this Decree and within the specified time

schedules established by or approved under this Decree.

19.     If Defendant fails to pay the civil penalty and interest required under Section IV

(Civil Penalties) when due, Defendant shall pay to the United States a stipulated penalty of

seventy-five hundred dollars ($7,500) per Day for each Day for each payment that is late.

20.     Unless excused under Section IX (Force Majeure), if Defendant fails to perform

the injunctive relief required under Section V (Injunctive Relief) when due, or comply with any

other requirement of this Consent Decree, Defendant shall pay to the United States a stipulated

penalty as follows:

a.      1st to 30th day: $2,000 penalty per day;

b.      31st to 60th day: $3,500 penalty per day; and

c.      More than 60 days: $5,000 penalty per day.

21.     Payment of any stipulated penalties shall be made in accordance with payment instructions in Section IV (Civil Penalties), except that the monies shall not be deposited into the Oil Spill Liability Trust Fund.

22.     All transmittal correspondence shall state that any such payment is a stipulated penalty pursuant to this Consent Decree for late payment of the civil penalty due under this Consent Decree or for delayed performance of injunctive relief required under this Consent Decree, as applicable and shall be sent to the United States in accordance with Section XIV of this Decree (Notices) and to the EPA Cincinnati Finance Office at: acctsreceivable.CINWID@epa.gov.

23.     For all payments of stipulated penalties to the United States, Defendant shall reference the Civil Action Number assigned to this case and DOJ Number 90-5-1-1-10332 and shall specify that the payments are for stipulated penalties pursuant to this Consent Decree to be deposited into the United States Treasury.

24.     Stipulated penalties under this Section shall begin to accrue on the Day after performance is due and shall continue to accrue until performance is satisfactorily completed. Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

25.     Defendant shall pay any stipulated penalty within thirty (30) Days of receiving a written demand from the United States.

26.     The United States may, in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due to the United States under this Consent Decree.

13

27.     Stipulated penalties shall continue to accrue as provided in this Section VIII (Stipulated Penalties) during any Dispute Resolution under Section X (Dispute Resolution), but need not be paid until the following:

a.     If the dispute is resolved by agreement or by a decision of EPA that is not appealed to the Court, Defendant shall pay accrued penalties determined to be owing, together with interest, to the United States within thirty (30) Days of the effective date of the agreement or the receipt of EPA's decision or order.

b.     If the dispute is appealed to the Court and the United States prevails in whole or in part, Defendant shall pay all accrued penalties determined by the Court to be owing, together with interest, within sixty (60) Days of receiving the Court's decision or order, except as provided in subparagraph c, below.

c.     If any Party appeals the District Court's decision, Defendant shall pay all accrued penalties determined to be owing, together with interest, within fifteen (15) Days of receiving the final appellate court decision.

28.     Defendant shall not deduct stipulated penalties paid under this Section in calculating federal income tax or any state income tax.

29.     If Defendant fails to pay stipulated penalties according to the terms of this Consent Decree, Defendant shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due.  Nothing in this Paragraph shall be construed to limit the United States from seeking any remedy otherwise provided by law for Defendant's failure to pay any stipulated penalties.

30.     Subject to the provisions of Section XII (Effect of Settlement/Reservation of Rights), the stipulated penalties provided for in this Consent Decree shall be in addition to any

14

other rights, remedies, or sanctions available to the United States for Defendant's violation of this Consent Decree or applicable law.

## IX.    FORCE MAJEURE

31.    "Force Majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Defendant, of any entity controlled by Defendant, or of Defendant's contractors, that delays or prevents the performance of any obligation under this Consent Decree despite Defendant's best efforts to fulfill the obligation.  The requirement that Defendant exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential Force Majeure event and best efforts to address the effects of any potential Force Majeure event (a) as it is occurring and (b) following the potential force majeure, such that the delay and any adverse effects of the delay are minimized or prevented to the greatest extent possible.  "Force Majeure" does not include Defendant's financial inability to perform any obligation under this Consent Decree.

32.    If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a Force Majeure event, Defendant shall provide notice orally or by electronic transmission to EPA within seventy-two (72) hours of when Defendant first knew that the event might cause a delay.  Within ten (10) Days thereafter, Defendant shall provide in writing to EPA an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Defendant's rationale for attributing such delay to a Force Majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of Defendant, such event may cause or contribute to an endangerment to public

health, welfare or the environment.  Defendant shall include with any notice all available documentation supporting the claim that the delay was attributable to a Force Majeure.  Failure to comply with the above requirements shall preclude Defendant from asserting any claim of Force Majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure.  Defendant shall be deemed to know of any circumstance of which Defendant, any entity controlled by Defendant, or Defendant's contractors knew or should have known.

33.     If EPA agrees that the delay or anticipated delay is attributable to a Force Majeure event, the time for performance of the obligations under this Consent Decree that are affected by the Force Majeure event will be extended by EPA for such time as is necessary to complete those obligations.  An extension of the time for performance of the obligations affected by the Force Majeure event shall not, of itself, extend the time for performance of any other obligation.  EPA will notify Defendant in writing of the length of the extension, if any, for performance of the obligations affected by the Force Majeure event.

34.     If EPA does not agree that the delay or anticipated delay has been or will be caused by a Force Majeure event, EPA will notify Defendant in writing of its decision.

35.     If Defendant elects to invoke the dispute resolution procedures set forth in Section X (Dispute Resolution) in response to EPA's determination in Paragraph 34, above, it shall do so no later than thirty (30) Days after receipt of EPA's notice.  In any such proceeding, Defendant shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a Force Majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Defendant complied

16

with the requirements of Paragraphs 31 and 32, above.  If Defendant carries this burden, the delay at issue shall be deemed not to be a violation by Defendant of the affected obligation of this Consent Decree identified to EPA and the Court.

## X.    DISPUTE RESOLUTION

36.    Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree.  Defendant's failure to seek resolution of a dispute under this Section shall preclude Defendant from raising any such issue as a defense to an action by the United States to enforce any obligation of Defendant arising under this Decree.

37.    Informal Dispute Resolution.  Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations.  The dispute shall be considered to have arisen when Defendant sends the United States a written Notice of Dispute. Such Notice of Dispute shall state clearly the matter in dispute.  The period of informal negotiations shall not exceed thirty (30) Days from the date the dispute arises, unless that period is modified by written agreement.  If the Parties cannot resolve a dispute by informal negotiations, then the position advanced by the United States shall be considered binding unless, within forty-five (45) Days after the conclusion of the informal negotiation period, Defendant invokes formal dispute resolution procedures as set forth below.

38.    Formal Dispute Resolution.  Defendant shall invoke formal dispute resolution procedures, within the time period provided in the preceding Paragraph, by serving on the United States a written Statement of Position regarding the matter in dispute.  The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Defendant's position and any supporting documentation relied upon by Defendant.

17

39.     The United States shall serve its Statement of Position within forty-five (45) Days of receipt of Defendant's Statement of Position.  The United States' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the United States.  The United States' Statement of Position shall be binding on Defendant, unless Defendant files a motion for judicial review of the dispute in accordance with the following Paragraph.

40.     Defendant may seek judicial review of the dispute by filing with the Court and serving on the United States, in accordance with Section XIV (Notices), a motion requesting judicial resolution of the dispute.  The motion must be filed within thirty (30) Days of receipt of the United States' Statement of Position pursuant to the preceding Paragraph.  The motion shall contain a written statement of Defendant's position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of this Consent Decree.

41.     The United States shall respond to Defendant's motion within the time period allowed by the Local Rules of this Court.  Defendant may file a reply memorandum, to the extent permitted by the Local Rules.

42.     Except as otherwise provided in this Consent Decree, in any other dispute brought under Paragraph 40, Defendant shall bear the burden of demonstrating that its position complies with this Consent Decree and better furthers the objectives of this Consent Decree.

43.     The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Defendant under this Consent Decree, unless and until final resolution of the dispute so provides.  Stipulated penalties with

18

respect to the disputed matter shall continue to accrue from the first Day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraph 40.  If Defendant does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section VIII (Stipulated Penalties).

## XI.   INFORMATION COLLECTION AND RETENTION

44.    This Consent Decree in no way limits or affects any right of entry and inspection or any right to obtain information, held by EPA or any State pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of Defendant to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

45.    Defendant shall retain electronically, and shall instruct its contractors and agents to preserve electronically, documents sufficient to demonstrate completion of the activities set forth in Paragraph 14, above, until three (3) years after termination of this Consent Decree.  At any time during this information-retention period, Defendant shall provide to EPA copies of any requested documents, records, or other information required to be maintained under this Paragraph in a searchable electronic format compatible with EPA's software where any data is sortable.  At the conclusion of the information-retention period, Defendant shall provide notice to EPA pursuant to Section XIV (Notices) at least ninety (90) Days prior to the destruction of any documents, records, or other information subject to the requirements of this Paragraph.  Upon request by EPA, Defendant shall deliver any such documents, records, or other information to EPA in a searchable electronic format compatible with EPA's software, where any data is sortable.  Defendant may assert that certain categories of documents, records, or other

information are privileged under the attorney-client privilege or any other privilege recognized by federal law.

46.     The reporting requirements of this Consent Decree do not relieve Defendant of any reporting obligations required by the CWA, its implementing regulations, or any other federal, state, or local law, regulation, or requirement.

47.     Any information provided pursuant to this Consent Decree may be used by the United States in a proceeding to enforce the provisions of this Consent Decree, or as otherwise permitted by law.

48.     Defendant may assert that notifications, submissions, reports, or other communications required by this Consent Decree contain confidential business information (CBI) pursuant to 40 C.F.R. Part 2 and/or applicable state law by specifically identifying or labeling, in writing, any confidential business information as such and stating the basis, from 40 C.F.R. Part 2, for the CBI claim.

## XII.   EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

49.     This Consent Decree resolves the civil penalty and injunctive relief claims of the United States for the violations alleged in the Complaint.

50.     The United States reserves all legal and equitable remedies available to enforce the provisions of this Consent Decree.

51.     The United States reserves all legal and equitable claims for, including but not limited to, injunctive relief, civil penalties, response and removal costs, expenses, damages including natural resource damages, criminal liability, and other appropriate relief, except as expressly stated in Paragraph 49, above.  This Consent Decree shall not be construed to limit the

rights of the United States to obtain additional relief under any federal law, implementing

regulation, or permit conditions, except as expressly specified in this Consent Decree.

52.     In any subsequent administrative or judicial proceeding initiated by the United

States for injunctive relief, civil penalties, response or removal costs, expenses, damages

including natural resource damages, criminal liability, or other appropriate relief relating to the

Facility or Defendant's violations alleged in the Complaint, including any proceeding related to

any Corrective Action Order or Notices of Probable Violation issued by the PHMSA, or any

removal order or order protecting public health issued by EPA pertaining to the Discharge and

related events, Defendant shall not assert, and may not maintain, any defense or claim based

upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion,

claim-splitting, or other defenses based upon any contention that the claims raised by the United

States in the subsequent proceeding were or should have been brought in the instant case, except

with respect to the claims that have been specifically resolved pursuant to Paragraph 49 of this

Section.  Defendant reserves any and all defenses or claims not specifically addressed in this

Section.

53.     This Consent Decree is not a permit, or a modification of any permit, under any

federal, state, or local laws or regulations.  Defendant is responsible for achieving and

maintaining complete compliance with all applicable federal, state, and local laws, regulations,

orders, and permits.  Defendant's compliance with this Consent Decree shall be no defense to

any action commenced pursuant to said laws, regulations, orders, or permits, except as set forth

herein.  The United States does not, by its consent to the entry of this Decree, warrant or aver in

any manner that Defendant's compliance with any aspect of this Consent Decree will result in

compliance with provisions of the CWA or with any other provisions of federal, state, or local laws, regulations, orders, or permits.

54.     This Consent Decree does not limit or affect the rights of Defendant or of the United States against any third parties that are not party to this Consent Decree, nor does it limit the rights of third parties that are not party to this Consent Decree against Defendant, except as otherwise provided by law, including but not limited to 33 U.S.C. § 1365(b)(1)(B).  This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not a party to this Consent Decree.

55.     Defendant hereby covenants not to sue and agrees not to assert any claims related to the Discharge, or response activities in connection with the Discharge, against the United States pursuant to the CWA or any other law or regulation for acts or omissions through the date of lodging of this Consent Decree.  Defendant further covenants not to sue and agrees not to assert any direct or indirect claim for reimbursement related to the Discharge from the Oil Spill Liability Trust Fund or pursuant to any other provision of law.

## XIII.   COSTS

56.     The Parties shall bear their own costs related to this Action and this Consent Decree, including attorneys' fees; except, however, that the United States shall be entitled to collect costs (including attorneys' fees) incurred in any action necessary to enforce this Consent Decree if the United States is the prevailing party.

## XIV.   NOTICES

57.     Unless otherwise specified herein, whenever notifications, submissions, reports, or communications are required by this Consent Decree, they shall be made in writing, sent

22

electronically where an email is indicated (for large files, electronic transmissions shall be made

with the EPA notice recipient), and addressed to all parties as follows:

As to the United States:

      To the U.S. Department of Justice:

            Chief (re: DJ # 90-5-1-1-10332)
            Environmental Enforcement Section
            Environment and Natural Resources Division
            U.S. Department of Justice
            P.O. Box 7611
            Washington, DC 20044-7611
            (202) 514-0097 (facsimile)

      To EPA:

            Donna Inman
            U.S. Environmental Protection Agency, Region 8
            1595 Wynkoop Street
            Denver, CO 80202
            Email: inman.donnak@epa.gov
            (303) 312-6201 (telephone)

As to Defendant:

            Caroline Henderson, or Successor
            SSHE Manager
             ExxonMobil Pipeline Company
            22777 Springwoods Village Parkway
            Spring, TX  77389
            (832) 624-7920 (telephone)
            caroline.b.henderson@exxonmobil.com

            Rebekah R. Bennett, or Successor
            General Counsel
             ExxonMobil Pipeline Company
            22777 Springwoods Village Parkway
            Spring, TX  77389
            (832) 624-6473 (telephone)
            rebekah.r.bennett@exxonmobil.com

58.     Any Party may, by written notice to the other Party, change its designated notice recipient or notice address provided above.

59.     Notices submitted pursuant to this Section shall be deemed submitted upon mailing, or emailing unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XV.     EFFECTIVE DATE

60.     The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter this Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

## XVI.     RETENTION OF JURISDICTION

61.     The Court shall retain jurisdiction over this case until termination of this Consent Decree for the purpose of effectuating or enforcing compliance with the terms of this Decree.

## XVII.  MODIFICATION

62.      The terms of this Consent Decree may be modified only by a subsequent written agreement signed by the Parties.  Where the modification constitutes a material change to any term of this Consent Decree, it shall be effective only upon approval by the Court.

## XVIII.  TERMINATION

63.     After Defendant has complied with the requirements of this Consent Decree and has paid the civil penalty and any accrued stipulated penalties as required by this Consent Decree, Defendant may serve upon the United States a Request for Termination, stating that Defendant has satisfied those requirements, together with all necessary supporting documentation.

64. Following receipt by the United States of Defendant's Request for Termination, the Parties shall confer informally concerning the Request and any disagreement that the Parties may have as to whether Defendant has satisfactorily complied with the requirements for termination of this Consent Decree. If the United States agrees that the Decree may be terminated, the Parties shall submit a joint stipulation terminating the Decree that shall automatically terminate this Consent Decree as of the date the joint stipulation is filed. If the United States does not agree that the Decree may be terminated, Defendant may invoke Dispute Resolution under Section X. However, Defendant shall not seek Dispute Resolution of any dispute regarding termination until one hundred and twenty (120) days after service of its Request for Termination.

## XIX.   PUBLIC PARTICIPATION

65. This Consent Decree shall be lodged with the Court for a period of not less than thirty (30) Days for public notice and comment. The Parties agree and acknowledge that final approval by the United States and entry of this Consent Decree is subject to notice of lodging of the Consent Decree and a public comment period. The United States reserves the right to withdraw or withhold consent if the comments disclose facts or considerations which indicate that this Consent Decree is inappropriate, improper, or inadequate.

66. Defendant agrees not to oppose entry of this Consent Decree by the Court or to challenge any provision of the Decree, unless the United States has notified Defendant in writing that it no longer supports entry of the Decree. Defendant consents to entry of this Consent Decree without further notice.

## XX.   SIGNATORIES/SERVICE

67.     The Deputy Section Chief, Environmental Enforcement Section, Environment and Natural Resources Division, United States Department of Justice, on behalf of the United States, and each undersigned representative of Defendant, certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to the terms of this Decree.

68.     This Consent Decree may be signed in counterparts, and such counterpart signature pages shall be given full force and effect.

## XXI.   INTEGRATION

69.     This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.  The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree.

## XXI.  FINAL JUDGMENT

70.     Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the United States and Defendant.


This Consent Decree is dated and entered this _____ day of _____, 2019.


_____
UNITED STATES DISTRICT JUDGE
District of Montana

26

Signature Page to Consent Decree in *United States v. ExxonMobil Pipeline Co.*

FOR PLAINTIFF UNITED STATES OF AMERICA:

Dated: _____

NATHANIEL DOUGLAS
Deputy Section Chief
United States Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section

Dated: 4/25/19

JAMES D. FREEMAN
Senior Trial Attorney
United States Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
999 18th Street
South Terrace Suite 370
(303) 844-1489 (telephone)
(303) 844-1350 (facsimile)
james.freeman2@usdoj.gov

27

Signature Page to Consent Decree in United States *v. ExxonMobil Pipeline Co.*

**FOR PLAINTIFF UNITED STATES OF AMERICA (continued):**

Dated: ___4/3/19___

_____
SUZANNE J. BOHAN
Assistant Regional Administrator
Office of Enforcement, Compliance and
    Environmental Justice
U.S. Environmental Protection Agency, Region 8
1595 Wynkoop Street
Denver, CO 80202

28

Signature Page to Consent Decree in *United States v. ExxonMobil Pipeline Co.*

## FOR PLAINTIFF UNITED STATES OF AMERICA (continued):

Dated: 4/24/19

SUSAN PARKER BODINE
Assistant Administrator
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
Ariel Rios Building, 2201A
1200 Pennsylvania Ave., N.W.
Washington, DC 20460

Dated: 4/15/19

ROSEMARIE KELLEY
Director
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W.
Washington, DC 20460

Dated: 4/11/19

MARK POLLINS
Director
Water Enforcement Division
Office of Civil Enforcement
U.S. Environmental Protection Agency
Mail Code 2243A
1200 Pennsylvania Ave., N.W.
Washington, DC 20460

Dated: 4/3/19

KELLY BRANTNER
Attorney-Advisor
Office of Civil Enforcement
Water Enforcement Division
U.S. Environmental Protection Agency
Mail Code 2243A
1200 Pennsylvania Ave., N.W.
Washington, DC 20460

Signature Page to Consent Decree in *United States. v. ExxonMobil Pipeline Co.*

**FOR DEFENDANT:**

**EXXONMOBIL PIPELINE COMPANY**

Dated: _3 /22/2019_                    By: _____

Gerald S. Frey



March 4, 2019

# APPENDIX 1

# ExxonMobil Pipeline Company

# Water Crossing Program Narrative

© Exxon Mobil Corporation



March 4, 2019

## Water Crossing Program Narrative

ExxonMobil Pipeline Company's (EMPCo) Global Pipeline Integrity Water Crossing Program (WCP) is a non-regulatory program intended to identify and manage the threats to pipelines at water crossings caused by physical forces of water during high flow storms and other natural events. The physical forces of high velocity flowing water during storms and other natural events are of particular focus because they could cause, either abruptly or over time, an unacceptable unsupported span length (USL) or exceedance of pipeline physical limitations. The WCP incorporated guidance from the U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration advisory bulletin released in 2015 (*Pipeline Safety: Potential for Damage to Pipeline Facilities Caused by Flooding, River Scour, and River Channel Migration)* and new American Petroleum Institute (API) Recommended Practice 1133 published in 2017.  Other pipeline threats such as corrosion and third party damage are managed under separate EMPCo programs or processes. Additionally, the WCP does not replace the Facilities Inspection and Maintenance Management System regulatory management program for navigable waterways of the U.S. subject to 49 Code of Federal Regulations 195.412.

This narrative describes the primary work flow processes that comprise the WCP.  It is important to note, however, that the WCP is an iterative process which is continually evaluated for improvements on a regular basis.  Specific procedures are included where greater detail is needed to explain activity performed by the WCP.  The Work Flow Process described in this narrative provides an overview of the existing technical processes that, based on the iterative evaluation process mentioned above, may be updated or enhanced in the future.

### Work Flow Process

The ultimate goal of the WCP and the processes described in this narrative is to complete necessary risk assessments and mitigations so that all water crossings in the WCP inventory enter long-term monitoring and maintenance status. Through the WCP, water crossings are managed through several phases of work to identify, inventory, prioritize, screen, assess, and classify crossings to provide appropriate monitoring and mitigation of conditions of concern.

© Exxon Mobil Corporation



March 4, 2019

These actions are organized into seven integrated and largely sequential phases of work that comprise the WCP work flow process, as shown below.



This work flow includes a series of processes, tools, and resources designed to provide a formal, consistent approach to measuring, managing, monitoring, and mitigating conditions encountered at water crossings. A more detailed schematic of the phased Work Flow Process which comprises the WCP is set forth in Figure 1 (attached). Conditions of concern may be associated with depth of cover, pipe protection, bank stability, bank erosion, pipeline supports, channel migration or channel avulsion.

### Inventory and Prioritization

The first phase is Inventory and Prioritization. Water crossing data and overall program information are collected and managed through the Water Crossing Inventory, which functions as a central database for storing, updating, managing, and reporting on EMPCo's water crossings. The Water Crossing Inventory is updated throughout the WCP work flow process to record the up-to-date status of each crossing in the WCP and track progress through each WCP phase of activity. After water crossings are recorded in the Inventory, they are prioritized for monitoring or screening.

### Screening and Data Gap Assessment

The next phase entails processing a crossing through a series of Screening questions and references in the Equipment Degradation Documents (EDD) and the Public Domain Consequence Assessment Process (PD-CAP). The output of these tools are water crossings that are screened for the need to get additional field data. The objective of the Screening Phase is to identify crossings that can be filtered into the monitoring phase and to prioritize non-filtered crossings for data gap analysis. Data gaps are filled through field inspections and site surveys that provide the information needed to properly evaluate current conditions of concern or potential future concerns.

### Classification

Based on the results and order determined during the screening steps, each water crossing undergoes a detailed evaluation process referenced as the Classification Phase. Water crossings are assigned a classification of high, medium, low, or monitored according the results of the detailed

© Exxon Mobil Corporation                                    3

# ExxonMobil

March 4, 2019

evaluation where the applicable conditions of concern are identified. The objective of the Classification Phase is to determine the appropriate classification (i.e., high, medium, low, or monitored) for each specific water crossing. The Classification Phase helps determine the specific conditions of concern and, in conjunction with the Risk Assessment Phase discussed below, the level of monitoring for each water crossing.

## Risk Assessment

The objective of the Risk Assessment Phase is to quantify the risks at a water crossing from natural force damage during flood conditions by performing a risk assessment. This process also helps to prioritize water crossings for mitigation, if required. Risk assessments evaluate specific risk scenarios associated with water crossings classified as high, medium, or low, and the resulting risk score is used to determine the need for mitigation. During the Risk Assessment Phase, frequency of required monitoring is also evaluated based on input from the Classification Phase. The appropriate risk assessment tools including Event Tree Assessment or a Scenario-Based Risk Assessment (SBRA) are selected dependent upon conditions of concern for each water crossing. The Event Tree Assessment Tool developed specifically for the WCP evaluates potential risks relative to mechanical loading on pipelines imposed by physical forces of water. A SBRA is conducted when conditions of concern at a water crossing fall outside the boundaries of the Event Tree Assessment Tool.

## Monitoring

The objective of the Monitoring Phase is to develop and implement a monitoring plan specific for each water crossing. Based on the results of the earlier work phases, a monitoring plan is generated for each crossing to identify and record new conditions of concern or changes to existing conditions of concern that may require further actions. The schedule requirements for the Monitoring Phase at each classified crossing will be based on the conditions of concern identified. If a water crossing has had an engineered mitigation, the monitoring plan will be used to confirm the long-term effectiveness of mitigation measures.

## Mitigation

Where appropriate, water crossing specific mitigation plans are developed and implemented to address conditions of concern identified during classification and risk assessment. Depending on the specific conditions of concern, local site conditions, and environmental factors, operational or temporary engineered mitigations may be implemented while permanent mitigation options are developed. Mitigation actions are then performed and recorded via site survey or other inspections. Once the water crossing mitigation has been confirmed to be performing in a satisfactory manner,



the crossing is ready to be reclassified through the WCP processes described above and a monitoring plan is created.

## Miscellaneous

Several coordination, data management, and quality control components are integrated into WCP processes to facilitate collaboration among management, Operations, WCP staff, and others for implementation and continuous improvement of the WCP. For example, alignment meetings among Operations and WCP personnel are required at several key stages of work to ensure the prompt exchange of information and concurrence on decisions regarding classification, monitoring, and mitigation of water crossings. Process and data quality control checks also are integrated at key stages, and all data are managed and maintained for appropriate planning, reporting, and decision making. WCP processes, procedures, and tools are reviewed and updated to ensure the WCP remains current and effective.



March 4, 2019

Figure 1 – Overview of the Water Crossing Program Phases of Work



© Exxon Mobil Corporation

6

APPENDIX 2

PARAGRAPH 14 CERTIFICATION

Pursuant to Paragraph 14 of the Consent Decree between the United States and ExxonMobil Pipeline Company (EMPCo), to be entered in the United States District Court, District of Montana, I, L.F. Madden, EMPCo Global Pipeline Integrity Manager, certifies that EMPCo has completed the Classification Phase and Risk Assessment Phase (if necessary) of its Water Crossing Program, as these phases are described in Appendix 1 of the Consent Decree, for each of the water crossings on the Silvertip Pipeline listed in Paragraph 15 of the Consent Decree, by doing the following:

    a.  evaluating, for each water crossing, all appropriate factors, including unsupported span length, scour or erosion modeling, flood events and duration, in accordance with ASME B31.4 Code of Pipeline Transportation Systems for Liquids, Bending Stress and Vortex Induced Vibration (VIV);

    b.  conducting an onsite survey of each water crossing using ExxonMobil's water crossing checklist, and performing desktop evaluations of available information, including but not limited to USGS maps, USGS flow data, Google earth, ExxonMobil inspections, historical information and other available sources to fully evaluate the river or stream conditions;

    c.  putting available public and field data, descriptions, evaluations, checklists, reports and other information into the electronic Water Crossing Program classification tool;

    d.  generating an electronic Classification Report for each water crossing that includes information from the Water Crossing Program classification tool, including a description of classification results: hydrology, hydraulics, and mechanical threats;

    e.  for those water crossings that the Classification Report classifies as High, Medium, or Low, generating an electronic Risk Assessment Summary Report, including a description of scenarios assessed during risk assessment, any mitigation identified including High Water Action Plan (if necessary), and the schedule for the completion of any such mitigation (if necessary); and

    f.  subjecting all water crossings to the Monitoring Phase of the Water Crossing Program for the development of a monitoring plan.

      I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on any personal knowledge I may have and my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information

submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fines and imprisonment for knowingly and willfully submitting a materially false statement.

Acknowledged and Certified by:

L.F. Madden
Global Pipeline Integrity Manager

Date:  3/20/19